## IN THE OREGON TAX COURT

Edgar A. COX

*v.*

## DEPARTMENT OF REVENUE
## MULTNOMAH COUNTY,
*Intervenor*
(TC 3405)

John G. Urban, Urban & Urban, Lake Oswego, represented plaintiff.

No appearance by defendant.

Sandra N. Duffy, Assistant County Counsel for Multnomah County, Portland, represented intervenor.

Decision for plaintiff rendered November 12, 1993.

**CARL N. BYERS, Judge.**

Plaintiff appeals the 1991 assessed value of vacant land. The market value of the land lies in its potential as a residential building site. The question is whether a bramblebush of government regulation will permit that value to be realized.

The subject land fronts on N.W. Luray Terrace in Portland. While the basic zoning is for residential use, the neighborhood is subject to an environmental overlay. The city ordinance imposing the overlay provides:

"**A.** **General.** The City has identified and inventoried natural resources and their public value. Some natural resource areas have been determined by the City to have greater public benefits than others. There are two overlay zones with different emphases to reflect two levels of natural resource areas.

"1. The Environmental Protection overlay zone is applied to areas with the highest functional values and where the City has determined the natural resource to be of such significant value that almost all development would have a detrimental impact. The regulations of the Environmental Protection zone are intended to be very stringent and are designed to preserve the resource and its values.

"2. The Environmental Conservation overlay zone is applied to areas with high functional values where the City has determined that development may be allowed if adverse impacts are mitigated. The regulations of the Environmental Conservation zone are intended to conserve the resource and its values." Portland, OR, Planning and Zoning Code, ch 33.430.020 (1992).

The city's environmental review process places the burden of proof on the landowner to show that a proposal for development of land subject to an overlay meets all the approval criteria that apply.

Plaintiff has owned the subject property since 1966. When the assessed value was increased from $5,800 to $49,500 in 1991, plaintiff decided to develop the property. However, upon inquiring about a building permit he became aware, for the first time, of the Balch Creek Watershed Protection Plan with the Environmental Protection overlays. He was informed that all but a five-foot strip of his property was in the Environmental Protection (EP) zone. The five-foot strip was located in the Environmental Conservation (EC) zone. Later, upon further inquiry, plaintiff was informed by a city planner that actually 18 feet of the property lay in the EC

zone. Property in this zone can be developed if the adverse impacts of development are mitigated. However, as plaintiff pointed out, 18 feet is not wide enough for a residence.

The regulatory scheme presents plaintiff with two major hurdles. First, he has to obtain a boundary change to increase the amount of EC zoning and diminish the amount of EP zone on his property. Second, if he is successful in obtaining a boundary change, he then has to apply for a building permit. To develop property in an EC zone, he has to comply with all requirements of the EC zone. Both hurdles are very high.

Plaintiff paid for a preapplication hearing and started the process. However, he learned that the expected costs for the required environmental impact evaluation, engineering study, soil analysis and other conditions, including the assistance of an attorney to guide him through the requirements, would require $25,000 to $35,000. Plaintiff concluded it was not reasonable to incur such costs when success is unlikely.

Plaintiff's position is supported by the testimony of a land-use attorney who also is a licensed real estate agent. This witness is familiar with the area and believes there is only a slim chance the city would approve a boundary change. Also, if a boundary change were approved by the city, there is a very high probability opponents would appeal the decision to the Oregon Land Use Board of Appeals and then to the Court of Appeals. This would further increase plaintiff's costs. The expert witness expressed her opinion that the subject property was not buildable.

Plaintiff's other witness was a real estate sales person familiar with the area and the subject property. This witness had experience with sales in the area and the restrictions on development. In her opinion, the subject property is not marketable because it is too steep, is on a winding street and the Environmental Protection overlay prevents any development. She believed it would make no economic sense to try to get the boundary line changed. This opinion was based on estimates of $50,000 to change the boundary line for another property. This person would not accept a listing of the subject property for sale.

Mr. Ken Collmer, an appraiser for Multnomah County, testified for intervenor that the property had a real market value of $20,000 as of July 1, 1991. Mr. Collmer's opinion was based primarily on the sale of Tax Lot 15 which sold in October, 1991, for $43,000 and resold in August, 1992, for $38,000. This property has similar problems as the subject but has approximately 28 feet in the Environmental Conservation zone. Mr. Collmer indicated he was allowing an additional $10,000 to reflect the greater difficulty of obtaining development on the subject. However, he admitted he had no idea how difficult it would be to build on the subject property.

■ The dispute between the parties arises from the assessor's policy of assuming that vacant land is buildable until proven otherwise. Mr. Collmer stated that the assessor's office has to assume such is the case. However, the statutory standard is "real market value" and the real market does not make such assumptions. Property which is subject to governmental restrictions making it necessary to obtain a zone change or variance before it can be developed will be discounted by the market. This discount will reflect the expense, time, risk, inconvenience and other problems involved in obtaining the government authorization. Thus, if a property that can be developed is worth $100,000, a similar property requiring a zone change for development will have a market value substantially less than $100,000. What makes appraising such property particularly difficult is the fact that zone changes involve political as well as economic considerations. Usually, there is very little market data, if any, indicating how much discount the market will apply.

One solution might be the cost to cure, an accepted appraisal technique usually associated with functional obsolescence in improvements. The discount from real market value could be measured by the amount it would cost to obtain government authorization for development. In applying this approach, it is necessary to recognize that political processes, especially discretionary processes, involve a high degree of risk. Here, the owner must expend $25,000 to $50,000 in an effort to obtain the legal right to develop the property.[1] Here,

---

[1] If the effort cost $50,000, it would far exceed the property's real market value. If an owner expended $25,000 to $50,000 to obtain the approvals and failed, the effect

even with such expenditure, it is unlikely that a zone change could be obtained. The court finds that no knowledgeable, prudent buyer would pay $20,000 for this property.

To fortify his position, plaintiff listed the property for sale at $39,000 for a short period but received no inquiries. Later, he listed the property for $2,000 plus payment of the back taxes. At that point he received two inquiries but no offers.

■      Plaintiff finds it particularly galling that government has, by regulation and without compensation, removed many of his property rights and then, for property tax purposes, imposed on him the burden of proving that those rights have been removed. The court finds it particularly difficult to set a value when land-use decisions are made by elected bodies subject to political considerations and influences. The difficulty is compounded when the decision is discretionary. Whether an application for a change in land use is looked upon favorably or unfavorably depends upon many factors. A decision may turn on whether the applicant has friends and influence in high places, a good or bad reputation for development or the financial resources to hire the experts that can move the political mountains. This is inconsistent with the philosophy of property taxation. Oregon's constitutional requirements of uniformity and equality assume assessed value will be based on the market forces without regard to individual ownership.

The court concludes that the subject property should not be assessed as if it can be developed. Plaintiff claims the cost of obtaining approval for developing the property gives it a zero value. However, the court is convinced that the property has some value, even if only for speculation. That value is nominal. Accordingly, the court finds that the real market value of the subject property as of July 1, 1991, was $2,000.

Plaintiff to recover costs and disbursements.

---

of that determination in the market would be to reduce the property's real market value.